FLOWERS v. STATE.

Ex parte FLOWERS.

No. A-11110.   Feb. 1, 1950.

(214 P. 2d 728.)

Donald M. Flowers, pro se.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

Cornish & Baumert, McAlester, amicus curiae.

JONES, P. J.   On January 30, 1948, Donald M. Flowers entered a plea of guilty in the district court of Kay county to the crime of burglary and was sentenced to serve a term of five years' imprisonment in the State Penitentiary; at the same time and place, the said Donald Flowers entered his plea of guilty to a charge of kidnapping and was sentenced by the court to serve a term of 20 years imprisonment in the State Penitentiary, the said terms of imprisonment to run consecutively and not concurrently.

Thereafter, the petitioner instituted an orignial action in habeas corpus in this court seeking to secure his release from confinement in the State Penitentiary and alleged that the judgments and sentences pronounced in the cases hereinabove named, in the district court of Kay county, were void for the reason that the defendant was without counsel and that the pleas of guilty were not voluntarily entered but said pleas were made because of coercion, threats and severe beatings administered to the accused by the officers of Kay county. The petitioner further alleged that during the 18 or 19 days he spent in jail in Kay county, he was whipped daily by Harold J. Mead, the undersheriff of Kay county; that he was bruised and beaten, and on the day he was taken before the district court for arraignment, he was told by the said Harold Mead to inform the court that he did not want the services of a lawyer, and when the defendant said that he would not do so, the said Harold Mead struck him with the butt end of a pistol, knocking him to the floor; that the said Mead told him that unless he entered his plea of guilty, he, the said undersheriff, would kill him when he got him back in jail.

Thereafter, and within the time authorized by law, the defendant took an appeal from the judgments and sentences rendered against him hereinabove described, and said appeals were consolidated with the habeas corpus action for the purpose of hearing and disposition.

At the time of the hearing before this court, there was filed on behalf of the accused two affidavits. One of these was from Doctor Richard A. Harkins, the prison physician, who swore that he examined the petitioner on February 2, 1948, at the prison hospital. He further swore:

"My physical examination of this inmate disclosed him to be suffering from many bruises about the chest, ribs and back, which apparently were inflicted by some kind of blows to the body, caused by stomping with the feet, or striking with a club or blackjack.

"At the time of my examination of the above named inmate, we did not have X-ray film available with which to secure pictures of the chest, of which might have been fractures of ribs numbers 4, 5, 6 and 7 right, and 7, 8, 9 and 10 left. This condition was severe enough to keep this inmate under treatment with heat massage and immobilization for ten (10) days. Both of this inmates eyes were blackened, caused from some kind of blows and all anterior upper teeth were loose, as also were many on both upper and lower jaws, both right and left. From all appearances, this inmate suffered a severe beating, or beatings, before entering this Institution, which records show to have been on the night of January 31, 1948. Hospitalization was required from February 2, 1948 until February 12, 1948."

Buster Higgins, a prison inmate and physician's assistant, swore:

"In fifteen (15) years of Dental experience in this Institution, I have yet to find or examine any inmate whose teeth and jaws were in as bad a condition, due to what certainly appeared to me to be caused from some kind of unmerciful beating, or beatings, as I found the above mentioned prisoner (Donald M. Flowers) in. Upon examining this inmates teeth I found them to be broken loose at the jaw bones on both the right and left sides of the jaws, some upper and some lower, and the upper anterior. I have almost continually treated this inmates teeth in an attempt to save them. It was apparent that he had received many severe blows in the mouth and both jaws, and there were also many bruises about his face. I also taped this inmates chest and ribs for severe injuries on both sides which from all appearances showed him to be suffering. A lack of X-ray film here in the Prison Hospital at the time, prevented the confirmation of this

condition by picture. His eyes were both blackened also, with many other bruises and lacerations about the head and face."

To refute the claim of the accused that he was mistreated, the state introduced affidavits of Raymond O. Craig, county attorney of Kay county, Walter Biewer, deputy state examiner and inspector, who was present in the sheriff's office at the time the said Flowers was taken to the State Penitentiary to commence the serving of his said sentences, of Roy Welch, sheriff of Kay county, of Ralph C. Haynes, county judge of Kay county, and of Harry Bain, chief of police of Newkirk. Each of these affiants swore that at the time Flowers was committed to the penitentiary there were no marks on the said Flowers of any kind, and no outward evidence of any mistreatment.

Judge Haynes swore:

"On the 2nd morning after said defendant Flowers had broken out of jail and had been apprehended at Perry, Oklahoma, that said Flowers was brought back to the Kay county jail at Newkirk, Oklahoma; that a certain officer informed this affiant that said Flowers had been beaten, whipped and threatened. That I went to the sheriff's office and contacted Undersheriff Harold Mead and told him I wanted to see the said Flowers. I was informed by said Mead that he would rather I not see the said Flowers. I wish to state, under oath, that some words were had with said Undersheriff Mead and I left the sheriff's office. Soon thereafter, and within 30 minutes, the sheriff and Mead came to my office and informed me to go talk to and see the said Flowers. I called the county attorney, Raymond O. Craig, and informed him what the rumor was and to go with me to the jail.

"I did go to the jail with said county attorney and contacted said Flowers. I informed him that I was the county judge and that the rumor was out that he had

been whipped and beat-up by some officer and that such practice would not be tolerated in this county and I would see that he was protected if I had to stay there with him until Judge Carver returned to the county.

"Flowers advised me, in the presence of the county attorney, that no one had threatened him or whipped him and that if I did not believe it to examine him. I looked in his mouth, examined his head, looked under his shirt, and went over his head completely and could find no evidence of his having been hit or mistreated. He had no black eye or any other evidence of rough treatment, and he denied it even when I guaranteed him safety.

"After that, I called upon him daily and never did I see any evidence of mistreatment. I was in court when he pleaded guilty and I could see nothing wrong with him. I had expected to find Flowers all beat-up and expected to do something about it, but I am fully convinced that he was not mistreated in any manner. I, personally, don't like Undersheriff Mead and that is common knowledge, but I am convinced he did not hit, whip or mistreat in any manner this said Flowers."

Raymond O. Craig, county attorney, swore:

"That in January 1948, Donald Flowers was confined in the county jail of said Kay county, held on the charge of second degree burglary in Kay county, and also held upon a warrant issued out of Washington, county, Oklahoma, charging armed robbery. That on or about January 13, 1949, affiant interviewed Flowers concerning jail break from the Kay county jail and the kidnapping of a farmer, one Donald Dorf. That previous to seeing Flowers on that date, affiant in making investigation of such matters had interviewed said Donald Dorf and other witnesses.

"That Flowers was fully advised of his rights and warned that any statement made by him in that connection could be used against him in the prosecution of the offenses alleged. Flowers thereupon stated that he wished to make a full statement. He was questioned by affiant and such questions and the answers, were taken

in shorthand by Miss Mary Norris, secretary in the county attorney's office. Said statement after transcription, was read over by Flowers, and subscribed and sworn to before Mr. H. L. Smiley, Court Clerk.

"Affiant further states, that between the 13th of January, 1948 and the date that Flowers was sentenced, he talked with him three or four times, both alone and in the presence of others, and that the last time he saw Flowers was in the district court when he was arraigned and sentenced. That on none of these occasions was there any evidence of mis-treatment, bruises, black eyes, or otherwise.

"Affiant further states that both before taking Flowers before the county judge, sitting as committing magistrate for arraignment, and before taking him before the district judge for arraignment, he was advised by affiant in the county attorney's office, of his right to counsel, and all other rights to which he was entitled; and was offered the use of the office telephone to call an attorney, and further advised that the court would appoint a lawyer for him if he could not obtain one for himself. That Flowers was against advised of all his rights by both Hon. Ralph C. Haynes, county judge, and Hon. Roy R. Carver, district judge, when arraigned before each of them, and that in each of said instances, Flowers stated that he waived all those rights, and desired to plead guilty and get started on his time. Judge Carver, after pronouncing sentence upon Flowers, advised him that he would be permitted to withdraw his plea if he so desired, to which the defendant replied that he did not wish to withdraw his plea of guilty.

"That in all of the instances herein mentioned, the defendant Flowers, acted without force, threat or duress."

Walter E. Biewer swore:

"That he is duly appointed and acting deputy examiner and inspector, under Hon. Chas. Morris, and that his station is at Newkirk, Oklahoma.

"Affiant says that on the 31st day of January, 1948, he was in the sheriff's office when Donald Flowers was

brought down and made ready to depart to McAlester, Oklahoma.

"Affiant says that said Flowers was in the sheriff's office for some 20 minutes and that there was no marks upon the said Flowers. That he had no black eyes and he appeared to be in very good spirits and told everyone good bye. Affiant feels sure that said prisoner had no marks of violence upon his face or person. That none were visible and the said Flowers was in good spirits."

The other evidence of the state was similar to these herein quoted. They were full and complete statements, and were at absolute variance with the claims of the accused that he was mistreated.

In addition Warden C. P. Burford swore that the petitioner was not confined to the hospital between February 2, and February 12, 1948, as sworn by the prison physician and that after an investigation he had found no one who could recall having observed any outward evidence of bruises or anything to indicate Flowers had been mistreated before entering the penitentiary.

The prisoner, about six months after he was sentenced on July 12, 1948, filed a motion for new trial and a motion to withdraw a plea of guilty and enter a plea of not guilty, which was denied.

Based on the above facts, this court, on September 7 1949, rendered an opinion affirming the judgment of the district court of Kay county, and denying petitioner's release by habeas corpus. Subsequent thereto, a petition for rehearing was filed on behalf of the petitioner, to which additional evidence in the form of affidavits bearing on the question at issue was submitted. Also, permission was granted to Cornish and Baumert, attorneys of McAlester, to appear amicus curiae and present certain exhibits in the form of photostatic copies of in-

struments on file in the State Penitentiary, and to submit a report of their investigation which they alleged supported the conclusions stated in the affidavit of Doctor Harkins. The Attorney General has filed an additional response to the brief of amicus curiae, and has detailed the results of his personal examination of the records in the State Penitentiary concerning this inmate. We have given all of these instruments full consideration.

Counsel for Doctor Harkins have furnished to the court photostatic copies of certain instruments which they alleged were part of the medical file of the petitioner, Flowers, and available to the warden at the time the Attorney General requested the warden for a statement as to anything within his knowledge or obtainable from the penitentiary files which might have a bearing upon the contentions of Flowers, or the authenticity of the statements set forth in the affidavit of the prison physician. Counsel for the prison physician have attached these photostatic exhibits to their pleading, and have stated that they form the basis for the statements set forth in the affidavit of Doctor Harkins, but were not before the court when the former opinion was rendered. They do not assert that these photostatic copies speak the truth as to Flowers' physical condition, and admitted the possibility that they may have been tampered with by prison inmates who worked as assistants to the prison physician and to the prison dentist. However, it is contended in justification of the Doctor's position that these medical cards were in existence and furnished to the Doctor at the time he made his affidavit, and that the affidavit was made in good faith in reliance upon the statements shown on the medical record.

The first of these instruments is a so-called medical card which was allegedly prepared at the time Flowers

was received at the penitentiary. This card gave the age, birth place, parentage, education, and other information not particularly pertinent to the issue here involved. At the printed portion of the card under the heading "Serious Illness" there is witten in ink "Injured left side-beat while in jail @ Newkirk." Then in a different writing under the same heading appears the following: "Chest, pictures-lite duty, R.A.H." Under the heading "Hospitalized" appears the following: "Admitted 2-2-48 Observ., Discharged 2-12-48." Then there is written, apparently in pencil, the following: "Bruises, head, back, and chest, possible rib fractures 4-5-6-7 right; 7-8-9-10 left."

There also appeared in the penitentiary files a letter from Warden Burford dated February 5, 1948, which reads:

"February 5, 1948
"Dr. Richard A. Harkins,
"Institution
    "Please examine Donald Flowers, No. 48750, tomorrow, February 6, and advise this office of your findings.
                            "C. P. Burford,
                                "Warden"

Also, in the prison file is a letter from Doctor Harkins dated February 13, 1948, in answer to the letter of the warden which states:

"February 13, 1948
"Mr. Lee Ford
"Warden's Secretary
"Institution
                        "Re: Flowers, Donald
                            "4875-W
"Dear Sir:
    "Pursuant to your recent request, I have this date examined the above captioned inmate physically and wish to submit the following report:

"He is a 38-year old white male of athletic build 5′ 8″ tall and weighing 165 pounds. Temperature and pulse were within the normal limits, and blood pressure was 120/90. Nose, throat, eyes, and ears were normal. Tonsils were removed in 1933. Lungs were clear and resonant with expansion free and equal. *There is some evidence of external violence which is superficial* since flouroscopic studies show no evidence of fracture.

"He advises that he has been hospitalized during his life only for the removal of his tonsils in 1933 and for an appendectomy which was performed in 1932. He advises that he has never had any serious injury. Other than for the above noted items, the physical examination was negative grossly.

"*He has been placed on light duty pending study of the rib condition and the extent of the injury.* (Italics ours.)

> "Very truly yours,
> "Richard A. Harkins, M. D.
> "Chief Medical Officer"

There further appears a letter of February 24, 1948, from the physician addressed to the Warden's secretary which states:

"February 24, 1948
"Mr. Lee Ford
"Warden's Secretary
"Institution

> "Re: Flowers, Donald
> "48750-W

"Dear Mr. Ford:

"Referring to my memo dated February 13th, with reference to a possible rib injury in the case of the above captioned inmate.

"X-ray studies this date reveals no X-ray demonstrable pathology of the rib cage, and no evidence of X-ray visible tuberculosis.

> "Respectfully,
> "Richard A. Harkins, M. D.
> "Chief Medical Officer"

There is further attached a photostatic copy of an instrument styled "Entrance Classification Report" which is dated February 3, 1948, and signed by the prison physician with his initials, R.A.H. In this instrument in response to the question, "Is the prisoner in need of medical or surgical attention?" there was inserted the answer "No" with the notation "Injured left side—was beat up while in jail in Newkirk." Some of the other questions and answers are as follows: "Condition of eyes? OK. Condition of teeth? Good. Does prisoner need glasses or dental care? No. Has the prisoner been hospitalized in the last thirty days? No."

The Attorney General has filed a response to the statements contained in the brief filed amicus curiae. In this response, attention is called to the fact that the medical card referred to is partially made out in ink with penciled notations, and calls attention to the fact that the statement on the card that the prisoner was admitted to the hospital on February 2, 1948, and remained until February 12, 1948, is in pencil and is evidently incorrect for the reason that the first medical examination was made by the prison physician as shown by his report on February 3, 1948, and that under the prison rules, the prisoner could not have been admitted to the hospital until after examination by the physician. The Assistant Attorney General further stated that because of the allegations and statements made in the brief amicus curiae, he went to the penitentiary on September 19, 1949, and made a personal examination of the prison records. He then states:

"I examined another record which is conclusive upon the matter, but which is not mentioned by counsel. If Flowers had been in the hospital for even one day his

name must necessarily have appeared upon the hospital count record where all patients in the hospital are listed each day. I examined this record for every day during the period of time it was claimed that Flowers was in the hospital. At no time did his name appear in the lists of patients. The names of all the other prisoners who were in the hospital appear, but Flowers' name was not among them. If he had been in the hospital but his name omitted from the record, such omission would have resulted in an immediate investigation, as the prisoners are counted every day and the omission of Flowers' name would have resulted in a shortage in the count. There can be no other conclusion than that Flowers was never in the hospital but was in his cell where he belonged."

The response again calls attention to the photograph of the petitioner made on February 2, 1948, which shows no trace of black eyes or bruises or lacerations on the face. Thereafter, permission was granted to file an additional report on behalf of petitioner in answer to the report of the Attorney General, which pleading considers paragraph by paragraph the contentions of the Attorney General. In answer to that part which mentions penciled notations appearing on Flowers card, it is stated that out of 200 medical cards examined at about the time the Flowers card was prepared, over 100 of them contained penciled notations similar to those on the Flowers card. As to the "hospital count record" stressed by the Attorney General, counsel state that the daily sick report referred to is prepared in an original form with two copies; that the originals are signed but the copies are not; that no originals can be found for the entire year of 1948, but that the report referred to by the Attorney General is an unidentified, unsigned carbon.

We have purposely made an extended statement of all the evidence before us. One of the things which particularly attracted the attention of this court was the let-

ter of February 5, 1948, from the warden directing an examination of the prisoner by the prison physician. This is one of the most unusual cases ever presented to the Criminal Court of Appeals because of the apparent conflict in the evidence for the petitioner and that of the state. Neither the Attorney General nor the warden were able to shed any light upon the letter written by the warden on February 5th. In an effort to ascertain the exact truth of all the charges' and countercharges, this court made inquiry of the Honorable Buck Cook, Commissioner of Charities and Corrections, as to whether any investigation had been made by his department of alleged beating of Flowers, and we there learned that on February 5, 1948, Mr. Cook received a letter which was forwarded to him by the mother of the petitioner, Flowers, which letter was purportedly written by Flowers to his mother from the penitentiary on February 3, 1948. In this letter, among other things, it stated:

"Meade came to my cell with his blackjack and paid me another visit—well as a result my ribs and left side are stomped in and beat in and in a bad shape. I'll get alright now though since I got away from up there. I had one month of solid beatings and I do not believe I would have got away alive if I didn't plead guilty * * *."

Immediately, upon receipt of this letter on February 5, 1948, the Commissioner of Charities and Corrections called the warden and asked him to have a medical examination made of the petitioner. This apparently was the motivating force which caused the warden to write the letter of February 5, 1948, to the prison physician. The complete report of the Commissioner of Charities and Corrections has been furnished to the court. The Commissioner assigned Mr. Hawkins, one of his investigators, to

go to the penitentiary immediately and made an investigation on the basis of the copy of the letter which had been furnished to the Commissioner written by Flowers to his mother. The investigator made an extensive investigation, not only at the penitentiary but also in Nowata and Kay counties, and concluded that the charges by Flowers were unfounded.

It is the rule that the trial court should be liberal in permitting a guilty plea to be withdrawn, a plea of not guilty substituted, and where there is any substantial evidence that a plea of guilty was entered through inadvertence, ignorance, coercion, or without deliberation, the trial court should allow such plea to be withdrawn and a plea of not guilty substituted so that a jury could determine the guilt or innocence of the defendant upon its merits. Wilson v. State, 82 Okla. Cr. 272, 168 P. 2d 898; Sloan v. State, 54 Okla. Cr. 324, 20 P. 2d 917.

This is not a case where a prisoner in the penitentiary has waited several years after his incarceration and then attempted through habeas corpus to secure his release on the ground that his plea of guilty was entered through ignorance, or because of force or threats exerted upon him. In the instant case, the petition for habeas corpus was filed shortly after the petitioner entered the penitentiary. Also, before the six months period had elapsed from which an appeal from the judgment and sentence pronounced against him could be taken, an appeal was lodged in this court. Both actions were consolidated for the purpose of this opinion.

There is no support in the record for the statement in the petition, nor in the physician's affidavit that "both of this inmate's eyes were blackened, caused from some kind of blows, and all anterior upper teeth were loose,

as also were many on both upper and lower jaws, both right and left." So far as the black eyes and damaged teeth were concerned, all of the evidence of injuries is to the contrary. The signed doctor's report furnished by his counsel states that the condition of teeth was good and that the prisoner did not need dental care. However, one thing stands out throughout all this confused maze of evidence, there apparently was an injury to the prisoner's side, and even if the Attorney General's contention that there was collusion between the physician and prisoner to effect the prisoner's release from prison is correct, yet in the letter of February 13, 1948, which is in the Warden's file, hereinabove quoted, and written at a time months before any alleged collusion would have occurred, the Doctor stated:

"There is some evidence of external violence," and "He has been placed on light duty pending study of the rib condition and the extent of the injury."

Amidst all of the evidence offered to refute the contention of petitioner, there is an absence of any affidavit or testimony of Harold Mead, undersheriff of Kay county, who was the man alleged by the petitioner to have administered the beatings to him which caused him to enter the plea of guilty.

It is a regrettable condition that all of the penitentiary records and other evidence bearing on petitioner's case were not presented prior to the rendition of the former opinion. This court has no way of knowing the facts in any case except by the record that is brought before us. We have a large number of habeas corpus actions filed each year by inmates of the penitentiary who do not have counsel. We have been liberal in the construction of their pleadings, and in the manner of the introduction of evidence in the hearing on such petitions.

In order to vacate a judgment and sentence by habeas corpus because of the alleged denial of fundamental constitutional rights, where the judgment is regular on its face, the proof of the petitioner must be clear, convincing, and without doubt. It has been our experience that most inmates of the penitentiary will swear to anything to secure their release from confinement. Their testimony alone, or even when supported by another inmate's statement, is not entitled to much weight. The instant case, while started as a habeas corpus case, is also an appealed case, and in a case which is appealed, in order to vacate a judgment rendered on a plea of guilty, the rule is less stringent, and where there is any substantial evidence to show that a plea of guilty was entered through inadvertence, ignorance, or because of threats, coercion or duress, the judgment should be vacated because trial of a case on its merits is favored.

The petitioner has falsely exaggerated his physical condition, and we believe that with the possible exception of an injured left side, there were no other injuries; but because of the apparent bruised side, there is sufficient element of truth in his contention that he was beaten while in the Kay county jail (which is uncontradicted by the man who is alleged to have done the beatings) that we have come to the conclusion that the pleas of guilty should be vacated and the petitioner remanded to the custody of the sheriff of Kay county for further arraignment on the charges there pending against him.

Before concluding this opinion, we feel constrained to comment upon one statement in our former opinion which read:

"It is apparent there was some connivance between the prisoner and the prison physician to attempt to effect petitioner's release from prison."

Under the record as presented to the court at that time, we felt impelled in order to uphold and maintain the integrity and purity of our court to make such statement. It seemed to us that such flagrant falsehoods should not be allowed to pass unnoticed and thus encourage a repetition of such conduct. The statement was fully justified under the record as then presented. The evidence of the petitioner, including the doctor's affidavit, was in irreconcilable conflict with that of the state and contrary to certain physical facts as shown by the petitioner's photograph and other evidence. However, if the complete record as presented on rehearing had been before the court at the time the first opinion was written, the above statement would not have been made. There are some gross inaccuracies in the physician's affidavit, but after learning more about the looseness with which the penal records were kept, and the fact that a large part of the records were prepared by inmates of the prison, we can perceive how the doctor might have signed an affidavit prepared by Higgins, the inmate who was the doctor's assistant, upon the representation by Higgins that the affidavit spoke the truth, and in such a case there would have been no intent to mislead or deceive this court. We have attempted fairly to present all of the evidence, and if the Attorney General is still convinced there was collusion between the doctor and the petitioner to commit perjury in order to effect petitioner's release from prison, he is vested, under the law, with authority to take appropriate action.

It is therefore ordered that the judgment and sentence in criminal cases number 3489 and 3490 in the dis-

trict court of Kay county, and all proceedings in said cases subsequent to the filing of the information against the accused, be and the same are hereby vacated and set aside.

It is further ordered that the warden of the penitentiary deliver the petitioner, Donald Flowers, to the custody of the sheriff of Kay county, and that he be held in the Kay county jail in accordance with law, pending his arraignment on the charges pending against him.

BRETT and POWELL, JJ., concur.